## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL PARKS CONSERVATION
ASSOCIATION
777 6th Street, N.W.
Washington, D.C. 20001-3723,

              Plaintiff,

  v.

DEPARTMENT OF THE INTERIOR
1849 C Street N.W.
Washington, D.C. 20240,

NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240,

SHAWN BENGE,
In his official capacity as Acting Director of the
National Park Service
1849 C Street, N.W.
Washington, D.C. 20240, and

DEBRA ANNE HAALAND,
In her official capacity as Secretary of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

              Defendants.

Civil Action No.  1:21-cv-171

## AMENDED COMPLAINT UNDER ADMINISTRATIVE PROCEDURE ACT

## TABLE OF ABBREVIATIONS

This table sets forth abbreviations identified in this Amended Complaint.

"APA" means the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*

"ATV" means all-terrain vehicles, one type of ORV.

"Canyonlands" means Canyonlands National Park.

"dBA" means decibels measured on an A-weighted scale.

"DEIS" means National Park Service's January 2014 Draft Off-Road Vehicle Management Plan/ Draft Environmental Impact Statement for Glen Canyon NRA.

"Enabling Act" means Pub. L. 92-593 (1972), 86 Stat. 1311 (codified at 16 U.S.C. §§ 460dd, *et seq.*), which established Glen Canyon NRA.

"Executive Order 11644" means Exec. Order 11644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977) and Exec. Order No. 12,608, 52 Fed. Reg. 34,617 (Sept. 9, 1987).

"FEIS" means National Park Service's Glen Canyon National Recreation Area Off-Road Vehicle Management Plan/Final Environmental Impact Statement (Jan. 2017).

"Final Rule" means the special regulation adopted by the Promulgating Release and set forth at 36 C.F.R. § 7.70(f).

"Flint Trail Provision" means 36 C.F.R. § 7.70(f)(4)(ii) of the Final Rule, which authorizes Glen Canyon NRA's superintendent to open the Flint Trail to ORV use.

"Glen Canyon NRA" or "NRA" means Glen Canyon National Recreation Area, a 1.2 million acre park in southeastern Utah, a unit of the National Park System managed by the National Park Service.

"Judgment" means the May 29, 2008 Judgment entered pursuant to the Settlement Agreement.

Lone Rock Beach ORV Play Area" or "ORV Play Area" means the area consisting of approximately 180 acres within which NPS has allowed unstructured ORV use near Lake Powell at Glen Canyon NRA.

"NEPA" means the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370.

"NPCA" means National Parks Conservation Association, Plaintiff in this action.

"NPS" means National Park Service.

"NPS Organic Act" means the Act which created the National Park System and National Park Service, now codified at 54 U.S.C. § 100101 *et seq.*

"Orange Cliffs" means the  Orange Cliffs Special Management Unit of Glen Canyon NRA.

"ORV" means off-road vehicle, a vehicle designed for and capable of traveling off of a road.

"ORV Plan" means the plan for designating routes and areas as open to ORV at Glen Canyon NRA, as adopted in the ROD but revised in the Final Rule.

The "Petition" refers to a 1999 petition filed by Blue Water Network and 70 other environmental organizations, including NPCA, asking NPS to adopt regulations and take other actions to comply with laws relating to use of ORVs in the National Park System, including Glen Canyon NRA, in order to prevent ongoing damage to those parks.

"Promulgating Release" means the release adopting the Final Rule published at 86 Fed. Reg. 3804 (Jan. 15, 2021).

"Proposed Rule" means the special regulation to implement the ORV Plan published for public comments at 83 Fed. Reg. 8640 (Feb. 28, 2018).

"Proposing Release" means the release containing the Proposed Rule published at 83 Fed. Reg. 8640 (Feb. 28, 2018).

"ROD" means National Parks Service's Record of Decision, Glen Canyon NRA Off-Road Vehicle Management Plan/Final Environmental Impact Statement (Aug. 2018).

"Rule-Making Petition Response" refers to a May 3, 2005 NPS letter to Russell Long responding to the Petition."

SAE International ("SAE") is an organization that produces a variety of technical standards.

"Settlement Agreement" means the May 12, 2008 Settlement Agreement between NPS and NPCA, among others, resulting from litigation commenced in 2005 challenging the manner in which NPS was regulating ORV use in the National Park System.

"1979 Plan" means 1979 General Management Plan for Glen Canyon NRA.

## INTRODUCTION

1.      Glen Canyon National Recreation Area ("Glen Canyon NRA" or the "NRA") is a 1.2 million acre park in southeastern Utah, a unit of the National Park System managed by the National Park Service ("NPS").  Glen Canyon was carved into the Colorado Plateau by the Colorado River and other rivers eons ago, just upriver from where the Colorado River enters the Grand Canyon.  Most of the NRA consists of desert incised by deep canyons, dry washes, and steep cliffs.  The area has been occupied by humans for at least 10,000 years, and there are accordingly many significant archeological resources in Glen Canyon NRA, including prehistoric Native American sites such as cliff dwellings, habitation sites, lithic and ceramic scatters, and rock art panels.  In addition, Glen Canyon NRA is rich with paleontological resources such as dinosaur tracks and dinosaur bones.

2.      This action challenges NPS's adoption of a regulation allowing off-road vehicles ("ORVs") in areas of the NRA.  36 C.F.R. § 7.70(f), 86 Fed. Reg. 3804 (Jan. 15, 2021).  That regulation allows continued ORV use in some areas where severe damage has already been found and will open to ORV use other areas where ORVs were previously prohibited.  That regulation will undoubtedly result in severe damage to Glen Canyon NRA's resources, which in many respects are fragile and vulnerable.  As NPS found, among other adverse consequences of ORV use, "ORVs are known to affect many of the natural and cultural resources of this region. Prominent among them are soils, water quality, air quality, vegetative communities, wildlife, watersheds, archeological, and ethnographic resources."

3.      Congress has mandated that NPS manage Glen Canyon NRA and other units of the National Park System in a manner that will leave them unimpaired for the enjoyment of future generations and to depart from that mandate only as Congress has "directly and

specifically provided." 54 U.S.C. § 100101(a), (b)(2).  Congress has not made any such

provision for ORV use in Glen Canyon NRA.  Moreover, Executive Order 11644 mandates that

plans for ORV trails or ORV use areas on federally owned land "be based upon the protection of

the resources of the public lands, promotion of the safety of all users of those lands, and

minimization of conflicts among the various uses of those lands."  Exec. Order 11644, amended

by Exec. Order 11989.  NPS regulation 36 C.F.R. § 4.10 requires compliance with that standard

in all park-specific regulations allowing ORV use.  *See* 36 C.F.R. § 4.10.

4.      NPS's ORV regulation for Glen Canyon NRA, 36 C.F.R. § 7.70(f), violates,

among other provisions of law, the Congressional mandates for its management, 36 C.F.R.

§ 4.10, and the Executive Order incorporated therein.  In addition, in reaching contrary

conclusions about ORV usage, NPS acted arbitrarily and capriciously.

5.      Plaintiff National Parks Conservation Association ("NPCA") therefore brings this

action under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, ("APA") to seek this

Court's review of NPS's new regulation for being contrary to law and arbitrary and capricious.

NPCA asks this Court to vacate 36 C.F.R. § 7.70(f) and to remand to NPS with appropriate

directions to bring itself into compliance with applicable legal requirements and limitations.

## THE PARTIES

6.      Plaintiff NPCA is a non-profit organization whose mission is to enhance and

protect the National Park System and its now 419 component units.  NPCA has more than 1.4

million members and supporters who love the National Park System and visit its component

units and derive great inspiration and pleasure from them, whether while visiting them or while

admiring them from afar.  Formed in 1919, only three years after the establishment of the

National Park System and NPS, NPCA's work has been a major factor in helping to shape and grow the National Park System.  NPCA is headquartered in Washington, D.C.

7.      Defendant Debra Anne Haaland is Secretary of the Interior and, as such, she is entrusted by Congress with the management of the National Park System, acting through the Director of NPS.  *See* 54 U.S.C. § 100101(a).  Her office is located at 1849 C Street, N.W., Washington, D.C.  At the time the regulation at issue here was adopted, David L. Bernhardt held that position.

8.      The Department of the Interior is an agency of the U.S. Government and is headquartered at 1849 C Street, N.W., Washington, D.C.

9.      Defendant Shawn Benge is the Acting Director of NPS.  As such, acting under the Secretary of the Interior, he is entrusted with management of the National Park System.  His office is located at 1849 C Street, N.W., Washington, D.C.  At the time the regulation at issue here was adopted, Margaret Everson held that position.

10.     Defendant NPS is the bureau of the Department of the Interior that manages the National Park System.  NPS is the agency that took the actions challenged in this Complaint. NPS is headquartered at 1849 C Street, N.W., Washington, D.C.

## JURISDICTION

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's other claims are asserted under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* ("APA") to review actions by Defendants in violation of other federal laws and regulations and which were arbitrary and capricious.

## VENUE

12.      Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(e) because all Defendants and Plaintiff NPCA reside in this District, and because a substantial part of the events and omissions giving rise to Plaintiff's legal claims transpired in this District.

## LEGAL FRAMEWORK

*Administrative Procedure Act*

13.      Under the APA, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(A) and (C).

*The NPS Organic Act and the Glen Canyon National Recreation Area Enabling Act*

14.      Under the National Park Service Organic Act (the "NPS Organic Act"), which created the National Park System and NPS in 1916, Defendants were charged with the duty to:

> promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wildlife in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a).  In 1970, Congress supplemented and clarified that mandate, providing that all units of the National Park System, "though distinct in character, are united through their interrelated purposes and resources into one National Park System as cumulative expressions of a single national heritage," *id.* § 100101(b)(1)(B), which "individually and collectively … derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one System."  *Id.* § 100101(b)(1)(C).  In 1978, Congress

added that the "the protection, management, and administration of the System units shall be

conducted in light of the high public value and integrity of the System and shall not be exercised

in derogation of the values and purposes for which the System units have been established,

except as directly and specifically provided by Congress." *Id.* § 100101(b)(2).

15.     The courts have interpreted the 1970s Organic Act amendments described and

quoted above as directing NPS "not to single out a particular class of units of the park system

(*i.e.* recreational units) for less protective treatment, but that instead NPS was to manage all units

of the park system so as to effect the purpose of the Organic Act—primarily resource

protection." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1451–52 (9th Cir. 1996),

as amended (June 17, 1996); *see also Michigan United Conservation Clubs v. Lujan*, 949 F.2d

202, 207 (6th Cir. 1991); *Nat'l Rifle Ass'n of Am. v. Potter*, 628 F. Supp. 903, 910 (D.D.C. 1986)

(explaining legislative history).  Accordingly, "except as directly and specifically provided by

Congress," 54 U.S.C. § 100101(b)(2), NPS must manage Glen Canyon NRA in the same manner

as it manages all other units of the National Park System.

16.     Two years after adopting the 1970 amendment to the NPS Organic Act, Congress

established Glen Canyon NRA as a unit of the National Park System subject to that Organic Act,

as well as other statutory authority "for the conservation and management of natural resources."

16 U.S.C. § 460dd-3 (referring *inter alia* to the Wilderness Act of 1964, *see id.* § 460dd-8).  Glen

Canyon NRA encompasses much of Lake Powell, which had been created by a dam on the

Colorado River in Utah and Arizona upstream of the Grand Canyon, but also includes significant

amount of land not adjacent to the lake.  Congress' purpose in creating this park was to "provide

for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto in the

states of Arizona and Utah and to preserve scenic, scientific, and historic features contributing to

public enjoyment of the area."  Pub. L. 92-593 (1972), 86 Stat. 1311 (codified at 16 U.S.C. §§

460dd, *et seq.*) (the "Enabling Act").  While Glen Canyon NRA was called a "national recreation

area," Congress clearly intended—as evidenced by the two separate purpose clauses—that NPS

would not only provide for "public outdoor recreation" on and adjacent to the lake, but that NPS

would also "preserve" Glen Canyon NRA's scenic, natural and historical resources, including the

backcountry opportunities away from the lake.  *See id.*  The lake occupies only 13% of Glen

Canyon NRA's area.

> The lands adjacent to the lake provide fascinating opportunities for side trips up
> practically unexplored side canyons which have become readily accessible for the
> first time because of the lake.  Further away, on lands where roads are few and
> primitive and where rivers are too shallow for boats, persons seeking to escape
> most evidences of modern society can get a real backcountry experience.

H.R. Rep. No. 92-1446, at 7 (Sept. 26, 1971).

17.     Congress expressly made certain exceptions for activities not permitted in other

units of the National Park System.  Those exceptions were for hunting, fishing and trapping, *id.*

§ 460dd-4, and mineral and grazing leases, *id.* § 460dd-5, all subject to stated limitations for the

protection of resources and other visitors.  Congress provided no similar exception, however, for

the use of ORVs in Glen Canyon NRA.  Absent such an exception, the Organic Act mandates

that preservation must be NPS's primary mission in managing that unit.  *See, e.g., Bicycle Trails

Council of Marin,* 82 F.3d at 1451–52.

***NPS Off-Road Vehicle Regulations and Executive Order 11644***

18.     In 1972, the President signed Executive Order 11644.  Prepared in response to

concerns about the "frequent conflict" between ORV use and "wise land and resource

management practices, environmental values, and other types of recreational activity," Executive

Order 11644 mandates that plans for ORV trails or ORV use areas on federally owned land "be

based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands." Exec. Order 11644, 37 Fed. Reg. 2,877 (Feb. 8, 1972), amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977) and Exec. Order No. 12,608, 52 Fed. Reg. 34,617 (Sept. 9, 1987) (as amended, "Executive Order 11644").  That Executive Order directs the head of each federal agency that manages public lands to promulgate regulations "to provide for administrative designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted." *Id.* § 3.  That Executive Order defined an "off-road vehicle" as "any motorized vehicle designed for or capable of cross-country travel on or immediately over land, water, snow, ice, marsh, swampland, or other natural terrain," with some exceptions not relevant here.  *Id.* § 2(3).

19.    Executive Order 11644 provides that ORVs may be located in the National Park System "only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values."  *Id.* § 3(a)(4).  That Order further directs that the designation of areas for ORV use must be in accordance with three other principles:

> (1)   Areas and trails shall be located to minimize damage to soil, watershed, vegetation, or other resources of the public lands.
> (2)   Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.
> (3)   Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

*Id.* § 3(a)(1)-(3).

20.     To comply with Executive Order 11644, NPS adopted 36 C.F.R. § 4.10.  That
regulation prohibits ORV use in any part of the National Park System except "on routes and
areas designated for [ORV] use," and mandated that any such designations must be
"promulgated as special regulations," which are regulations applicable only to specific parks.
*Id.* § 4.10(a), (b).  Such routes and areas "may be designated only in national recreation areas,
national seashores, national lakeshores and national preserves."  *Id.* § 4.10(b).  Even in one of the
permitted categories of units, the designation of routes and areas "shall comply with …
Executive Order 11644 (3 CFR, 1971–1975 Comp., p. 666)."  *Id.*  In any such designation,
therefore, NPS must make the determination that use in the designated routes or areas "will not
adversely affect their natural, aesthetic, or scenic values," Exec. Order 11644 § 3(a)(4), and must
be located so as to comply with the Order's other requirements quoted above.  In 2006, NPS
interpreted the Order as also protecting "cultural" values.  *See* 2006 NPS Management Policies
§ 8.2.3.1.

## FACTUAL ALLEGATIONS

### A.  Glen Canyon National Recreation Area

21.     Glen Canyon NRA, encompassing about 1.2 million acres, is located on the
Colorado Plateau.  The Colorado Plateau offers "a natural diversity of rugged water- and wind-
carved canyons, buttes, mesas, and other outstanding physiographic features."  *See* NPS, Glen
Canyon NRA Off-Road Vehicle Management Plan/Final Environmental Impact Statement (Jan.
2017) (the "FEIS") at 8.  Glen Canyon was carved into the Colorado Platea by the Colorado
River and other rivers eons ago, just upriver from where the Colorado River enters the Grand
Canyon, also carved by that river.  In modern times, a dam on the Colorado River created the
186-mile-long Lake Powell, which straddles the Arizona-Utah border.  *Id*. at 97-98.  Of Glen

Canyon NRA's area, 13% is covered by the lake, particularly in the southeastern portion of the NRA.  *Id.* at 98.  "The other 87% of Glen Canyon consist of upland desert incised by deep canyons, dry washes, and steep cliffs, as well as talus, and clay or sliprock badlands."  *Id.*  "It is a desert region of rock, arid shrublands, grasslands, and low-growing pinyon/juniper woodlands." *Id.* at 97; *see also* Exhibit A hereto (Map of Glen Canyon NRA).

22.     Glen Canyon NRA has an abundance of wildlife.  "Glen Canyon supports a complex and fragile ecosystem, with plants and wildlife that have developed unique adaptations to the arid conditions of their environment."  FEIS at 116.  These include both large mammals such as bighorn sheep and small ones such as rodents.  *Id.* at 116, 122.  "Mammal species generally more vulnerable to ORV activity include burrowing species … that nest in open sandy sites and whose burrows are easily crushed.  In addition to ORVs crushing habitat, engine noise can deafen a kangaroo rat and virtually eliminate its defensive hearing.  Bighorn sheep are also known to be intolerant of noise and ORV activities, and can abandon areas where such activity is common."  *Id.* at 117 (citations omitted).

23.     In addition, the Glen Canyon region has been occupied by humans for "at least 10,000 years."  *Id.* at 180.  There are many significant archeological resources in Glen Canyon NRA, including prehistoric Native American sites such as cliff dwellings, habitation sites, lithic and ceramic scatters, and rock art panels.  *Id.* at 178-79.  There are also seven National Register-listed archeological sites and 874 other sites determined to be eligible for listing in the National Register, of which 72 have been recommended for listing.  *Id.* at 179.  A further 1,214 sites have not yet been evaluated.  *Id.*; *see generally id.* at 178-91.

24.     Moreover, "Glen Canyon contains a very extensive fossil record" of particular eras.  *Id.* at 421.  "Particularly vulnerable to damage are the many dinosaur track ways that are

managed in situ.  The effects on desert soils from off-road use, such as accelerated surface water

runoff and erosion … also pertain to paleontological resources, which occur in local

concentrations in lithologic units."  *Id.*  "Glen Canyon has a nearly complete record of Mesozoic

rocks, with many geologic formations containing abundant and significant fossils."  *Id.* at 204.

Paleontological resources at Glen Canyon NRA include not only dinosaur tracks but also

dinosaur bones as well as marine invertebrates, fish, turtles and marine reptiles.  *See generally id.*

at 204-13.

25.     The  Orange Cliffs Special Management Unit of the NRA ("Orange Cliffs") is

located in the far northern and eastern extremes of the NRA, far from human activity.  It contains

"a scenic row of Wingate Sandstone cliffs, from the top of which one can view the vast and

spectacular panoramas of [adjacent] Canyonlands National Park."  *See* FEIS at 175.  "The

foreground view … is stunning, with the sandstone cliff face plunging abruptly downward over

1,000 feet …."  *Id.*  "The beauty of the landscape is complemented by the area's isolation and

solitude."  *Id.* at 176.  In the 1979 General Management Plan for Glen Canyon NRA (the "1979

Plan"), NPS determined that the Orange Cliffs unit was to be "maintained as a critical backdrop

for Canyonlands National Park and as a major vantage point for spectacular views into the park."

*Id.* at 32.  Moreover, NPS proposed most of that area for designation as wilderness in that Plan.

Accordingly, that area has been managed "to maintain a relatively primitive, undeveloped

atmosphere."  *Id.*

26.     Under an agreement between management of Glen Canyon NRA and the

management of Canyonlands National Park ("Canyonlands"), which is adjacent to Orange Cliffs,

that Park has long managed Orange Cliffs in the same manner as the adjacent area of

Canyonlands is managed.  Canyonlands explained in its Backcountry Management Plan, adopted

in 1995, that the Orange Cliffs part of Glen Canyon NRA was included

> because the area adjoins Canyonlands National Park, is similar in physiography,
> and is experiencing many of the same problems with growing visitation.  Thus, to
> increase consistency and protection for visitors to both the Maze District of
> Canyonlands and the Orange Cliffs in Glen Canyon, the Orange Cliffs will be
> managed in the same manner as the Maze District, with the exception of mandated
> differences in grazing in the Orange Cliffs.[1]

27.    Glen Canyon NRA shares borders with other National Park System units, in

addition to the Orange Cliffs' sharing a border with  Canyonlands National Park as described

above.  *See* NPS, Record of Decision, Glen Canyon NRA Off-Road Vehicle Management

Plan/Final Environmental Impact Statement (Aug. 2018) ("ROD") at 1.

**B.  Types of Off Road Vehicles**

28.    As relevant here, "off-road vehicle" or "ORV" means broadly any type of

vehicle designed for or capable of traveling cross-country immediately over land, including all-

terrain vehicles ("ATV"), motorcycles, and other vehicles primarily designed for or capable of

off-road travel.  *See* Executive Order 11644; FEIS at 5.  For simplicity of reference, all such

vehicles are referred to here as "ORVs."  One particularly popular type of ORV is, to use its

brand name and model, the "Polaris RZR."  Unlike the traditional ATV which is straddled by the

rider, these vehicles have more than one seat and separate suspensions for each wheel so they

can be driven easily and at high speed over rocks and other obstacles.  As the maker states about

one line of vehicles:  promoted for "the toughest terrains," "[w]ith 181 horsepower, the PRO XP

---

[1] *See* Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation
Area, Backcountry Management Plan (Jan. 1995).

11

4 is fitted with a large turbo to create more boost, and a power band focused on snappier acceleration between 20 and 50 miles-per-hour."[2]

29.     A different type of ATV is referred to as a "street-legal ATV," which is a vehicle designed for or capable of travel over natural or unimproved terrain but which is also legal to operate on a state road or highway. *See* FEIS at 5-7. When those vehicles are referred to here, they will be identified as such.

### C.  NPS Begins An Evaluation of ORV Use In Response to Rulemaking Petition and Lawsuit Based on Violations of the Organic Act, Executive Order 11644, and 36 C.F.R. § 4.10; NPS Enters Settlement Agreement

30.     In 1999, Blue Water Network and 70 other environmental organizations, including NPCA, petitioned NPS to adopt regulations and take other actions to bring itself into compliance with laws relating to use of ORVs in the National Park System, including Glen Canyon NRA, in order to prevent ongoing damage to those parks (the "Petition"). NPS responded to the Petition on May 3, 2005. In that response, NPS denied the Petition but committed to two actions to be taken in any park that was to continue to allow ORV use. Specifically, NPS would:

> ask each park area to evaluate existing use to determine whether to allow [ORV] use to continue on an interim basis. If [ORV] use is to continue, then the park area must develop an interim [ORV] Use Management Plan. Second, the park area will initiate the necessary steps to develop an [ORV] Use Management Plan with environmental and economic compliance, and a special regulation to authorize [ORV] use.

May 3, 2005 NPS letter to Russell Long ("Rule-Making Petition Response").

---

[2] Jon Crowley, *Polaris Takes the Four-Seat Experience to the Next Level With All New RZR® PRO XP 4 Lineup*, UTVGUIDE.NET, October 15, 2019, https://www.utvguide.net/polaris-takes-the-four-seat-experience-to-the-next-level-with-all-new-rzr-pro-xp-4-lineup/.

31.     In July 2005, and pursuant to the Rule-Making Petition Response, NPS's Deputy Director commenced a survey of a number of National Park System units, including Glen Canyon NRA, in which ORV use existed but which were not in compliance with 36 C.F.R. § 4.10.  The purpose of the evaluation "[wa]s to review the types of resource impacts associated with existing use and to determine whether to allow [ORV] use to continue on an interim basis while the [ORV] Use Management Plans, special regulations, and their required environmental compliance, are being prepared."  Glen Canyon NRA responded by Memorandum on October 4, 2005, reporting to the Deputy NPS Director that Glen Canyon NRA management did allow ORV use in some areas although not in compliance with law.  Glen Canyon NRA proposed to continue to allow ORV use in two areas while steps were taken to bring itself into compliance with law. One such Plan related to the "Lone Rock Beach ORV Play Area."  *See* 2007 Updated Recommended OHV Interim Management Plan at Lone Rock Beach OHV Use Area at 1.  That area consists of about 180 acres near a beach on Lake Powell, within which NPS has allowed unstructured ORV use.  *See id.* at 13.  The other Interim Plan related to "Accessible Shorelines" along Lake Powell, a number of places along the shore which were accessible by ORVs.  *See* 2007 Updated Recommended OHV Interim Management Plan at Glen Canyon Accessible Shorelines at 1.

32.     Unsatisfied with NPS's actions, NPCA and others filed a lawsuit in 2005 against NPS.  On May 12, 2008, after initial litigation, NPS entered into the Settlement Agreement with NPCA and the other plaintiffs.  The Settlement Agreement required NPS, among other things, to "diligently proceed with evaluating ongoing off-road vehicle authorization in Glen Canyon NRA … as stated in" the NPS's Rule-Making Petition Response.  May 12, 2008 Settlement Agreement ("Settlement Agreement") at 4.  In addition, NPS agreed that only the ORV use covered by the

13

Interim Plans would be allowed in Glen Canyon unless and until NPS adopted special regulations authorizing such use.  *See id.*

33.     The Settlement Agreement and May 29, 2008 Judgment ("Judgment") entered thereunder provided that the dismissal of plaintiffs' claims would be without prejudice in the event that, within four years from the date of the Settlement Agreement, NPS had not either adopted special regulations for ORV use in Glen Canyon NRA or terminated authorization of ORV use there.  *See id.*; *see also* Judgment at 2.  Moreover, the Judgment provided that "[n]othing herein or in the related Settlement Agreement shall imply any agreement with or approval by the Plaintiffs of the legality or appropriateness of any off-road vehicle use in [Glen Canyon], nor shall anything herein or therein preclude any legal challenges to any special regulation authorizing off-road vehicle use in that unit."  Judgement at 2-3.

**D.  NPS Prepares an Environmental Impact Statement and Adopts Its ORV Plan for Glen Canyon NRA**

34.     In January 2014, NPS released for public comment a Draft Off-Road Vehicle Management Plan/ Draft Environmental Impact Statement ("DEIS") under the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370 ("NEPA").  Three years later, in January 2017, NPS issued its FEIS under that Act.  The FEIS stated that the purpose of the planning effort included:

- To evaluate the impacts associated with allowed but unauthorized off-road use in Glen Canyon and to determine what management action should be taken.

- To determine whether NPS will authorize off-road use in accordance with Executive Orders 11644 and 11989 (off-road vehicles on public lands), NPS laws, regulations (36 Code of Federal Regulations 4.10), and policies to minimize impacts on Glen Canyon.

- To evaluate the impacts resulting from off-road use by non-conventional motor vehicles in Glen Canyon and determine what management actions should be taken.

FEIS at 1.

35.     The FEIS evaluated five alternative plans, one of which was designated as NPS's "Preferred Alternative."  On August 15, 2018 (corrected on September 7, 2018), NPS adopted its Record of Decision under NEPA (the "ROD"), adopting the Off-Road Management Plan at issue here (the "ORV Plan").

36.     Under the ORV Plan, the 180-acre area called the "Lone Rock Beach ORV Play Area" would be opened for unstructured ORV use.  ROD at 9-10.  Some beaches along accessible Lake Powell shorelines would be closed to ORVs, but others would be open to conventional motor vehicles and ORVs.  *Id.* at 10.  Street-legal ATVs would be authorized on most paved park roads.  *Id.*  Street-legal ATVs and other ORVs would also be authorized on unpaved park roads (except most roads in the Orange Cliffs Special Management Unit, discussed below).  *Id.*

37.     While the DEIS did not evaluate opening any portion of the Orange Cliffs to ORV use, the FEIS added to the preferred alternative the opening of eight miles of unpaved park roads called the "Poison Spring Loop" to ORV use, which was adopted in the ROD.  *See* ROD at 10; *see also id.* at 11 (easing otherwise applicable ORV permitting requirements for certain routes).

38.     A number of other provisions were part of all alternatives considered in the FEIS, such as equipment requirements, monitoring and mitigation plans.  *See* FEIS at 35-51.

39.     Of particular note is NPS's abandonment under the ORV Plan of the otherwise applicable requirements limiting noise impacts from motor vehicles.  NPS's regulations set that limit at 60 decibels of noise measured at 50 feet.  *See* 36 C.F.R. § 2.12 (60 dBA limit).  NPS has replaced that limit for the ORV Plan with a noise limit of 96 decibels, as discussed below.  *See* ROD at 7.  NPS explained that any greater limitation, *i.e.*, a lower maximum noise level, "would

effectively prohibit all [off highway vehicles] and ATVs and most motorcycles from Glen

Canyon."  FEIS at A-116.  "All machines purchased in the last decade would easily meet this

[new] requirement unless the muffler system has been altered."  *Id.*

> ### E. NPS Acknowledged that the ORV Plan Will Cause Significant Adverse Impacts to Glen Canyon NRA's Resources and Values

40.     NPS made findings in the FEIS and in the ROD about adverse impacts that would

result from the ORV Plan.  The FEIS acknowledged that NPS's Preferred Alternative, which

later became the ORV Plan (with some loosening of restrictions), will cause a number of

conflicts with non-ORV visitors and result in significant adverse impacts on soils, vegetation,

wildlife, protected species, soundscapes, archeological and paleontological resources and

ethnographic resources.  NPS stated:  "ORVs are known to affect many of the natural and

cultural resources of this region.  Prominent among them are soils, water quality, air quality,

vegetative communities, wildlife, watersheds, archeological, and ethnographic resources."  FEIS

at 377.

41.     Additional examples of adverse impacts acknowledged in the FEIS include:

- Soundscapes:  While NPS's methodology is dubious, it acknowledges that, due to ORV use, 21.8% of the Glen Canyon NRA land area may experience a significant increase in sound level compared to the natural ambient sound.  *See* FEIS at 321, Table 30.  In addition, ORV noise could be heard at a significant level even a mile away from the ORV.  The closer a person is to the ORV, however, the greater the impact.  *See* ROD at 24.  Vehicle noise will directly affect 8.9% of wilderness areas, among other places.  *See* FEIS at xvi.

- Wilderness and Backcountry:   The NPS concluded that the impacts would be "adverse for visitors seeking a quiet, backcountry experience."  *Id.* at 326.  "[T]his impact [both noise and "increased air emissions"] could be ... great enough to discourage future visitation."  *Id.* at 371.  There will be adverse impacts on wildlife and non-motorized human uses (*i.e.*, enjoyment of quiet and wilderness soundscapes). Indeed, NPS found that "[u]navoidable impacts on proposed wilderness would result from motor vehicle noise being audible to visitors and affecting the opportunity for visitors to experience natural quiet and solitude, thus compromising the primeval characteristics of the proposed wilderness area."  *Id.* at 472.

- Visitor Conflict:  NPS found that increased ORV use in areas such as the Ferry Swale management area will cause conflicts with non-ORV users such as hikers and others seeking a "backcountry experience."  *Id.* at 372, 368.

- Sensitive Wildlife Species:  NPS concluded that there would be "[d]irect, adverse impacts on wildlife and wildlife habitat at Lone Rock Beach, Lone Rock Beach Play Area, and approximately 6,175 acres at 14 accessible shorelines as a result of disturbance, displacement, vehicle-wildlife collisions, noise, and habitat destruction." *Id.* at xiii, Table ES-3.

- Cultural, Archeological and Paleontological Resources:  NPS discussed in detail the known adverse effects of ORV use on cultural, archeological and paleontological resources, including breakage and damage to artifacts and resources; damage to surface features and cultural deposits; and erosion and other soil impacts.  *Id*. at 377-79, 420-21.  The FEIS also stated that there is a correlation of road proximity to vandalism that will likely result in damage to these resources through increased intentional collecting and accidental damage.  *Id.* at 378.  Moreover, ORV use has adverse effects on "[p]articularly vulnerable" dinosaur track ways.  *Id.* at 421.  *See generally id.* at 204-13, 375-93, 420-433.  NPS found that "continued use of off-road motor vehicle use may result in long-term, direct, adverse impacts on" sites eligible for the National Register in the shoreline areas and "long-term, indirect, adverse" impacts on sites within the GMP Roads, as well as "long-term adverse cumulative impacts" on numerous National Register-eligible historic sites in Glen Canyon NRA. *Id.* at 38-88.

- Vegetation:  NPS found there would be direct, adverse impacts on vegetation communities at Lone Rock Beach, Lone Rock Beach Play Area, and direct impacts on 3,808 acres of vegetation at 14 accessible shorelines and 21 miles of ORV routes. *Id.* at xiii, Table ES-3; 261-263.  There would also be a likelihood that nonnative, invasive species would spread due to motor vehicle use and "overall impacts on vegetation would be long-term and adverse."  *Id.* at 262-63.

- Soils:  Over 6,000 acres and 21 miles of ORV routes will experience direct, adverse impacts from crushing, shearing, compaction, and erosion of soils.  *Id.* at 246-48, 246-50; xiii, Table ES-3.

- Additional Harm from Illegal ORV Use: NPS acknowledges that "ATV users have been observed riding around 'Road Closed' and 'No ATV' signs.  The presence of illegal off-road tracks, by both ATV and conventional four-wheel-drive vehicles, are routinely observed during ranger patrols."  *Id.* at 204; *see also id.* at 203 (non-compliance is a common finding in ORV surveys).  In other words, NPS's assessments of the significant impacts on the NRA's resources and values assume compliance with the ORV Plan's restriction and do not reflect the additional, more severe impacts that will arise from illegal ORV use.

17

**F. NPS Adopts A Special Regulation Implementing Its ORV Plan, With a Major Change**

42.     On February 28, 2018, NPS proposed the adoption of a special regulation to implement the ORV Plan (the "Proposed Rule").  83 Fed. Reg. 8640 (Feb. 28, 2018) (the "Proposing Release").

43.     On January 15, 2021, NPS published its final regulation implementing that Plan. 86 Fed. Reg. 3804 (Jan. 15, 2021) (the "Promulgating Release").  In all material respects relevant here, and with one major exception, that regulation, 36 C.F.R. § 7.70(f) (the "Final Rule"), is the same as that NPS determined in the ROD to adopt.

44.     Contrary to the ORV Plan adopted in the ROD and contrary to the Proposed Rule that did not provide for ORV use on what is known as the Flint Trail in the Orange Cliffs, and without allowing any opportunity for public comment on this significant change, that Final Rule provides that the NRA's superintendent "may determine whether [ORVs] are allowed on a 15-20 mile section of an unpaved [road] known as the upper portion of the Flint Trail within the Orange Cliffs Special Management Unit pursuant to paragraph (6) of this section [which authorizes the superintendent to "close or reopen designated area or routes"].  36 C.F.R. § 7.70(f)(4)(ii) (the "Flint Trail Provision").  The Flint Trail Provision authorizes Glen Canyon NRA's superintendent to act thereunder, not by the adoption of a special regulation as required by 36 C.F.R. § 4.10(b), but merely by issuing an order and then giving public notice that he had done so by posting signs, publication in maps or "other appropriate methods."  36 C.F.R. §§  7.70(f)(4)(ii) (superintendent to act as to Flint Trail pursuant to Section (6) thereof), 7.70 (f)(6)(ii) (superintendent to provide public notice of actions "through one or more of the methods listed in § 1.7 of this chapter), 1.7 (listing methods of giving notice)).

45.      Significantly, NPS stated in the Promulgating Release that it had not accepted some commenters' request that NPS open <u>all</u> unpaved roads in the Orange Cliffs to ORVs because doing so "would increase day-use traffic and noise disturbances in a manner that would make it difficult to maintain a relatively primitive and undeveloped atmosphere."  86 Fed. Reg. at 3808.  But NPS sought to permit the superintendent to engage in his own evaluation, separate and perhaps different from that set forth in the FEIS, and determine to open a 15-to-20 mile portion of the Flint Trail in that same area.

46.      NPS had proposed in its 2014 DEIS to close all roads in Orange Cliffs to ORV use.  In the FEIS published in January 2017, NPS changed the ORV Plan from closing all roads in Orange Cliffs to ORVs to opening the Poison Springs Loop Road there.  But the ORV Plan, as set forth in the FEIS and ROD, as well as the Proposed Rule, continued to prohibit ORV use elsewhere in the Orange Cliffs, including on the Flint Trail.

47.      During the succeeding four years, NPS did not adopt the Proposed Rule.  When the Final Rule was adopted on January 15, 2021 by the Assistant Secretary of the Interior for Fish and Wildlife and the Parks, *see* 86 Fed. Reg. at 3815, the Final Rule for the first time included the Flint Trail Provision. [3]

## PLAINTIFF'S STANDING

48.      Plaintiff NPCA has standing to assert its APA claims as a representative of its members.  *See Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 28 (D.D.C. 2016).  To have representational standing, a plaintiff organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is

---

[3]  Plaintiff NPCA has written to Defendants advising them of NPCA's position that they violated the APA by adding the Flint Trail Provision in the Final Rule.

germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Natl. Wildlife Federation v. U.S. Army Corps of Engineers*, 170 F. Supp. 3d 6, 11 (D.D.C. 2016) (citation omitted).  The claims asserted here meet the second test because this action seeks to advance NPCA's mission and purpose, as set forth under "The Parties," above.  The claims meet the third test because the nature of Plaintiff's claims relate to Defendants' decisions and actions, which do not require individual member participation in this action.

49.     To meet the first test for organizational standing, Plaintiff must show that at least one of its members would have standing personally to sue.  Plaintiff meets that test because at least two of its members would have standing to sue in their own right.  Environmental plaintiffs adequately allege injury in fact when they allege that they use the area in question and are persons "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Nat. Res. Def. Council v. E.P.A.*, 489 F.3d 1364, 1370 (D.C. Cir. 2007) (internal citation omitted).

50.     David Nimkin, who lives in Salt Lake City, Utah, is a member of NPCA.  He loves the outdoors, particularly Glen Canyon NRA and the adjacent part of Canyonlands National Park, which he can access only through the NRA, including its Orange Cliffs area.  In both parks, he enjoys hiking, camping, and seeing and photographing cultural objects, natural rock formations, and wildlife, among other things.  He particularly enjoys the clear night skies and the solitude of the remote areas of the parks.  He has enjoyed Glen Canyon NRA in these manners by visits there in the past for his personal enjoyment.  He intends and plans to do so again at some time in the period of September 10 through December 9, depending on what permit he can get for such a visit.  He cannot apply for such a permit until May, 2021.  *See*

20

Canyonlands National Park Overnight Backcountry Permits, Canyonlands National Park-Recreation.gov.  NPS's ORV Plan challenged here will permit the use of ORVs in and near such remote areas where he plans to visit, among other places of concern to him.  ORV use there will degrade and interfere with his ability to enjoy those areas by, among other things, causing loud noises and by throwing up dust, which will clog the otherwise pristine quality of the air and which will block the otherwise clear dark nights when he enjoys star gazing.  A favorable decision for NPCA here, which would vacate the ORV Plan and 36 C.F.R. § 7.70(f), would mean that ORVs would not be allowed in Glen Canyon thereunder, which would redress Mr. Nimkin's injuries.

      51.     Tom Carter lives in Kanab, Utah, and is a member of NPCA.  From 1986 until his retirement in 2004, he served as an Interpretive Park Ranger with NPS.  He worked in that capacity at several National Parks, including Grand Canyon National Park near the NRA.  In the off-season, he worked with teachers at elementary schools in Arizona and Utah to teach students about the geology of Grand Canyon.  He has long enjoyed visiting National Parks, including Glen Canyon, in his personal capacity as an outdoorsman as well as his official NPS capacity. He has lived in Kanab, Utah since 1995, where he is surrounded by National Parks, including Zion National Park, Bryce Canyon National Park, Canyonlands National Park, and Glen Canyon NRA.  Throughout his years in Utah, he has visited the National Parks regularly to hike, camp, backpack, and kayak.  He loves the environment there and cares deeply about preserving its ecology and native plants, as well as the serenity of these outdoor spaces.

      52.     Mr. Carter has visited Glen Canyon NRA regularly since 1986, and he plans to continue to do so.  For the last twelve years, he has visited Glen Canyon NRA annually with his wife, Marcia Martin.  They go there approximately four times each summer.  When they go

21

there, they camp at Lone Rock Beach and generally stay for one or two nights.  They like to stay

at Lone Rock Beach because it is the only place they can camp in a tent and launch their kayaks

directly onto Lake Powell.  It is also special for them to be able to camp near the lake.  They feel

that kayaking on Lake Powell is like nothing else—it is incredible. The sky is generally clear, the

water is beautiful, and it is serene.  To them, it is like being in a different world.  Being on Lake

Powell makes Mr. Carter feel relaxed, rejuvenated, and healthy.  At night, he and his wife like to

watch the night sky.  They have plans to return to Glen Canyon NRA the summer of 2021.

While there, they plan to camp again at Lone Rock Beach and from there, to kayak on Lake

Powell.  He is looking forward to spending time on the beautiful water and seeing the stars.

53.    Not far from Lone Rock Beach, however, is the Lone Rock Beach Play Area (the

"ORV Play Area").  NPS states that the ORV Play Area is "adjacent" to the Lone Rock Beach.

Even before adoption of the Final Rule, NPS allowed ORVs to operate at the ORV Play Area in

an unrestricted and high-intensity manner.  FEIS at 362 (describing pre-Final Rule status).  In

Mr. Carter's experience, NPS's allowing such ORV use is unusual for a National Park.  At the

ORV Play Area, the ORVs run all day until late at night and disrupt his enjoyment of the nearby

Lone Rock Beach camping area.  The ORVs' motors are very loud as they tear up and down the

hills at the ORV Play Area.  Visually, the ORVs are also disruptive, as their headlights zip

around those hills, and they cause fine, soft sand to billow in the air.  The noise, headlights, and

dust from the ORV Play Area ruin the otherwise peaceful atmosphere at Lone Rock Beach when

Mr. Carter is trying to enjoy the company of his wife and friends and when they try to see the

stars at night.  His ability to enjoy Lone Rock Beach is significantly harmed because NPS

permits ORVs to drive in an unrestricted manner at the ORV Play Area.  He is very concerned

about the disruption and degradation that the ORV use allowed by the Final Rule will have on

his enjoyment of Glen Canyon NRA and Lone Rock Beach.  Prohibiting or limiting ORV use in

the ORV Play Area would significantly improve the quality of his experience camping on Lone

Rock Beach and kayaking on Lake Powell.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Lone Rock Beach ORV Play Area -- Impairment of Resources and Values; Section
10(e)(B)(1) of the Administrative Procedure Act for Agency Action Not in Accordance with
Law; NPS Organic Act, 54 U.S.C. § 100101; Glen Canyon Enabling Act, 16 U.S.C.
§§  460dd, *et seq.*)**

54.     Paragraphs 1-53 are hereby incorporated by reference in this First Claim for

Relief as if fully set forth herein.

55.     Section 10(e)(B)(1) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A),

requires a reviewing court to "hold unlawful and set aside agency action, findings and conclusion

found to be … not in accordance with law."  5 U.S.C. § 706(2)(A).  NPS's adoption of its ORV

Plan is not in accordance with law because, contrary to the mandates of the Organic Act, NPS

has managed, and its ORV Plan would manage, the ORV Play Area in such a way as to impair

the resources of that area and nearby areas.

56.     The most basic mandate on NPS's management of the National Park System is

"to conserve the scenery, natural and historic objects, and wild life in the System units and to

provide for the enjoyment of the scenery, natural and historic objects, and wild life <u>in such</u>

<u>manner and by such means as will leave them unimpaired for the enjoyment of future</u>

<u>generations</u>."  54 U.S.C. § 100101(a) (emphasis added).  NPS has officially interpreted this

mandate as "the cornerstone of the Organic Act" and "the primary responsibility of the National

Park Service."  2006 NPS Management Policies § 1.4.4.  NPS may not allow the "impairment of

park resources or values unless directly and specifically provided for by legislation."  *Id.*

Impairment is an impact that "would harm the integrity of park resources or values." *Id.* § 1.4.5; *see also* § 1.4.6 (explaining resources and values); 54 U.S.C. § 100101(a), (b).

57.     The ORV Play Area consists of 180 acres of sand shrub and blackbrush desert vegetation, along with some areas of exposed slickrock.  NPS has long allowed ORV use in the ORV Play Area, although such use was contrary to legal requirements.  The ORV Plan will continue to allow "high-intensity" ORV use in that Play Area "in an unrestricted manner."  *See* FEIS at 58, 238, 470.  As NPS stated in the Proposing Release:

> *Lone Rock Beach Play Area* is located on a hill above and to the southwest of Lone Rock Beach.  This 180-acre area is enclosed by a fence and open to unrestricted, high-intensity ORV use.  This is a place where ORV operators can challenge themselves, develop riding skills, operate at high speeds, and perform jumps and hill climbs.  There is no speed limit in the play area.

83 Fed. Reg. at 8640.

58.     NPS acknowledges that continuation of the type of ORV use at the ORV Play Area described in the previous paragraph would have severely adverse impacts on resources and values, and as to some resources, "exceptionally severe" adverse impacts.  Unrestricted ORV use there will continue to cause deep rutting, destruction of soils and vegetation and harassment of wildlife, among other things.  The loud ORV noise from unrestrained ORV use there will interfere with other visitors seeking to enjoy Lone Rock Beach.

59.     Soils there have "been affected through years of motor vehicle use, and damage to substrate through shearing, compaction, and erosion resulting from motor vehicle use would continue and potentially increase in severity of impact."  FEIS at 238, 243, 247.  The NPS 2007 Interim Plan for the "Lone Rock Beach ORV Use Area," referred to in paragraph 31, *supra,* put it more graphically:

> There is widespread evidence of erosion where [ORV] activity has occurred. Typically, heavily used trails are eroded from about 6 inches to about 1.2 feet

24

> below the surrounding level …. There has been extensive mobilization of sand, and subsequent movement down slope towards Lone Rock Beach. Where trails reach the rim of the bench erosion has been greater and some trails are eroded up to 6-feet deep through the rim.… One cutting downslope on the east side towards the beach is up to 10 feet or more deep in places …. Mounds of windblown fines and sand occur around shrubs, forming shrub-islands.… Most recently used trails are completely devoid of vegetation.… The principal threats to wildlife from [ORV] activity include crushing and collapse of burrows and nests, and direct harassment of diurnal species during foraging and nesting.… [One archeological site] was found totally destroyed, likely as a result of [ORV] activity.

2007 Updated Recommended OHV Interim Management Plan at Lone Rock Beach OHV Use Area at 7; *see also* FEIS at 268-69, 279, 285-87 (adverse impacts to wildlife in ORV Play Area).

60. The ORV Plan's impact on noise stemming from ORV use at the ORV Play Area would also be particularly severe. Applying its 96 dBA noise limit, NPS found that ORV sound would travel up to over one mile from the ORV Play Area. FEIS at 353. All of nearby Lone Rock Beach, a major site of visitation to the shores of Lake Powell, would be in the "noise effect zone." *Id.* "This would include impacts on the listening area of wildlife and non-motorized human uses. The duration of impacts would be extensive—the [Play Area] in particular can result in nearly continuous motorized vehicle use during the day." *Id.* Moreover, discussing the ORV Play Area even before adoption of the ORV Plan, NPS found that "the higher speed and frequent maneuvers conducted in the play area (vehicles operating at full throttle) contributes to a relatively higher intensity of soundscape impacts in comparison to the impacts from the same vehicle operating under cruise conditions along roadways." *Id*. at 327. Disregarding the likely ineffectiveness of the 96 dBA limit to improve these impacts (*see* Sixth Claim For Relief, *infra*), NPS acknowledges that the sound could travel even farther than one mile. *Id.*

61. NPS justifies its management of the ORV Play Area by pointing to the Glen Canyon Enabling Act's statement that the purpose of the recreation area is in part: "to provide for the public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto."

*See* ROD at 19.  The purpose clause invoked by NPS does not justify the type of high intensity and highly destructive recreational ORV use NPS is permitting at the ORV Play Area.  Congress did not "directly and specifically," 54 U.S.C. § 100101(b)(2), provide for use of this nature. While Congress specifically provided in the Enabling Act for several other types of recreational uses, such as hunting and fishing, nowhere in the Enabling Act did Congress even mention ORV use.  Even if, *arguendo,* the part of the purpose clause relied on by NPS could be read to allow some ORV use adjacent to Lake Powell, the other part of the purpose clause—"and to preserve scenic, scientific, and historic features contributing to public enjoyment of the area," 16 U.S.C. §§ 460dd, *et seq.*—negates the notion that Congress "directly and specially" permitted NPS to allow the type of high intensity, unrestricted, and highly destructive recreational ORV use being allowed at the ORV Play Area.

62.     Accordingly, by permitting unlimited and unrestricted ORV use at the ORV Play Area, NPS has violated and is violating the no-impairment mandate of the NPS Organic Act and the preservation purpose of the Glen Canyon Enabling Act.

**SECOND CLAIM FOR RELIEF**
**(Lone Rock Beach ORV Play Area --Arbitrary and Capricious Determination of Non-Impairment; Section 10(e)(B)(1) of the Administrative Procedure Act for Agency Action That Is Arbitrary and Capricious.)**

63.     Paragraphs 1-62 are hereby incorporated by reference in this Second Claim for Relief as if fully set forth herein.

64.     Section 10(e)(B)(1) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), requires a reviewing court to "hold unlawful and set aside agency action, findings and conclusion found to be arbitrary and capricious or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

65.     NPS made a determination that the ORV Plan would not impair Glen Canyon NRA's resources or values at the ORV Play Area, *see* ROD at 18, Attachment A, but that determination was arbitrary and capricious.  That is so because NPS's analysis began with "current" ORV use and evaluated the ORV Plan based on whether it would worsen adverse effects of that usage.  For example, while acknowledging that impacts from ORV use at the ORV Play Area are "especially severe," *see* ROD at 20, 21, and while stating that the ORV Plan would "result in the continuation of severe impacts" to soils and vegetation, *id*. at 20, NPS found that the impacts would not cause impairment because ORV use would be limited to "existing routes and areas."  *Id*.; *see also id.* at 25 (as to sound impacts, the ORV Plan "could result in slightly greater impacts on soundscapes than current conditions.").

66.     NPS's inappropriate method of supposedly evaluating its ORV Plan's impairment of the NRA's resources and values, as described in the preceding paragraph, was a continuation of, and was based upon, NPS's method of purportedly evaluating impacts of that plan generally, at Lone Rock Beach and other locations.  Under NEPA, an agency is required to evaluate impacts of a proposed action by comparing impacts of that action with impacts assuming no such action was taken.  That "no action" alternative is accordingly to serve as a "baseline" against which the impacts of the proposed action is to be evaluated.  *See* FEIS at 57.  Here, NPS acknowledged that it had previously allowed ORV use in the NRA without complying with legal requirements.  *See, e.g*., FEIS at 2-3; paragraphs 30-31, 34, *supra*.  The purpose of this planning exercise was to evaluate whether to discontinue ORV use at the NRA or to bring itself into compliance with 36 CFR § 4.10 and Executive Order 11644.  *Id.*  In such an evaluation, it is arbitrary and capricious to use as a baseline for comparison the admittedly unlawful state of

affairs before acting.  And that is particularly the case when one possible course of conduct would be to discontinue ORV use there.  *See* paragraphs 30-31, 34, *supra*.

67.     Nevertheless, NPS here used the 2007 Updated Recommended OHV Interim Management Plan at Lone Rock Beach OHV Use Area (see paragraph 31, *supra*) as the baseline against which to compare the impacts of the ORV Plan on the ORV Play Area.  Using that interim plan as the baseline for that analysis was arbitrary and capricious because that interim plan (i) acknowledged that current usage there was illegal and (ii) stated that the purpose of that interim plan was merely to provide for management of that area while NPS brought itself into legal compliance.  Using the interim plan as a baseline for evaluating the impacts there of the ORV Plan therefore turned on its head the purpose of NPS's environmental impact statement.  Moreover, NPS acted arbitrarily and capriciously by relying on that evaluation in the FEIS in order to find that the ORV Plan would not impair Glan Canyon NRA's resources and values.

68.     NPS's non-impairment analysis was accordingly arbitrary and capricious because the ORV use in Glen Canyon NRA pre-existing that analysis was permitted by NPS in violation of law, including, among others, the NPS Organic Act, the Glen Canyon Enabling Act, 36 C.F.R. § 4.10, and Executive Order 11644.

**THIRD CLAIM FOR RELIEF**
**(Lone Rock Beach ORV Play Area -- Adverse Impacts and Failure to Minimize; 36 C.F.R. § 4.10 and Executive Order 11644; Section 10(e)(B)(1) of the Administrative Procedure Act for Agency Action Not in Accordance with Law and Arbitrary and Capricious)**

69.     Paragraphs 1-68 are hereby incorporated by reference in this Third Claim for Relief as if fully set forth herein.

70.     Section 10(e)(B)(1) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), authorizes a reviewing court to "hold unlawful and set aside agency action, findings and conclusion found to be arbitrary and capricious or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).  NPS's adoption of its ORV Plan is not in accordance with law because it violates 36 C.F.R. § 4.10, which incorporates and requires compliance with Executive Order 11644 ("Rule 4.10"), and because NPS's claim of compliance was arbitrary and capricious.

71.     Rule 4.10, by incorporating Executive Order 11644, allows ORV use "in areas of the National Park System, Natural Areas, or National Wildlife Refuges and Game Ranges only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order 11644 § 3(a)(4) (emphasis added).  Rule 4.10 also mandates that ORV routes and use areas be located to minimize adverse impacts to resources and to minimize conflicts with other visitors.  *See id.* §§ 1, 3.  NPS made no determination that the use of ORVs in the areas and on the routes permitted by the ORV Plan would "not adversely affect" their natural, aesthetic, or scenic values. Exec. Order 11644 § 3(a)(4).  Instead of making that required determination, NPS interpreted that phrase as meaning that NPS will not allow ORV use that causes "unacceptable impacts" or would be an inappropriate use, as those terms are explained in the 2006 NPS Management Policies.  86 Fed. Reg. at 3811.

72.     An "appropriate use" is one "that is suitable, proper, or fitting for a particular park, or to a particular location within a park."  2006 NPS Management Policies § 1.5. "Appropriate visitor enjoyment is often associated with the inspirational qualities of the parks. As a general matter, preferred forms of enjoyment are those that are uniquely suited to the superlative natural and cultural resources found in the parks and that (1) foster an understanding of and appreciation for park resources and values, or (2) promote enjoyment through a direct association with, interaction with, or relation to park resources."  *Id.*  NPS also makes clear that "many forms of recreation enjoyed by the public do not require a national park setting and are

29

more appropriate for other venues.  The Service will therefore … provide opportunities for forms of enjoyment that are uniquely suited and appropriate to the superlative natural and cultural resources found in the parks" and defer to others to meet the "broader spectrum of recreational needs and demands."  *Id.* § 8.2.

73.     "Unacceptable impacts," according to the Management Policies, are those that, among other things, collectively or individually, would "be inconsistent with the park's purposes and values"; "create an unsafe or unhealthful environment for visitors"; unreasonably interfere with "an appropriate use"; or unreasonable interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in … natural … locations within the park."  *Id.* § 1.4.7.1.

74.     Even if NPS was within its authority to interpret Rule 4.10's mandate that ORVs could only be allowed with a determination that they would not "adversely affect" resources, NPS's determination that the ORV Plan would not cause "unacceptable impacts" or allow an inappropriate use was arbitrary and capricious because the facts as found by NPS in its FEIS make clear the ORV Plan will indeed result in "unacceptable impacts" and inappropriate uses. Moreover, NPS failed to explain, particularly in light of those FEIS findings, how the ORV Plan will not allow inappropriate uses or create unacceptable impacts.  NPS merely restated the words of the Management Policies explaining those requirements and concluded that, "within the context of the resources and values of the [NRA], motor vehicle use on the routes and areas designated by this rule would not cause unacceptable impacts to the natural, aesthetic, or scenic values of the [NRA]."  86 Fed. Reg. at 3811.

75.     Contrary to NPS's conclusion, the ORV Plan's provisions and 36 C.F.R. § 7.70(f) for the ORV Play Area creates "unacceptable impacts" and cannot be justified as an "appropriate

use," even under the Enabling Act's purpose to allow outdoor recreation adjacent to the Lake.

*See* 2006 NPS Management Policies §§ 1.4.5, 1.4.7.1, 1.5.  The type of ORV use allowed at the

ORV Play Area is fast recreational driving, hill-climbing, and jumping with no speed limit or

other restrictions, testing the driver's abilities.  This type of ORV use "create[s] an unsafe or

unhealthful environment for visitors," which alone makes the activity impermissible under the

standard of an "unacceptable impact."  *Id.* § 1.4.7.1.  This type of activity is dangerous to the

driver and to others, and fosters drug and alcohol use as well as other scofflaw conduct among at

least some ORV users, as NPS enforcement efforts have made clear.  *See* FEIS at 411.  This type

of activity also creates unacceptable impacts because it is highly damaging to the park's

resources, as the FEIS found.  Moreover, this type of ORV use cannot be consistent with the

Management Policies' description of an "appropriate use."  2006 NPS Management Policies

§ 1.5.  This type of ORV use does not depend on being conducted in a unit of the National Park

System; users can engage in this type of conduct anywhere there is sand or dirt.  This sport does

not depend on, and is not enhanced by, the inspirational qualities of the resources or values of the

NRA, or on its superlative nature.  That type of recreational use, moreover, is unlike any of those

described in the Enabling Act's legislative history, which mentions sightseeing, boating, fishing,

swimming, and similar activities, but nothing comparable to the high-speed ORV rides permitted

—and indeed promoted—at the ORV Play Area.  *See* H.R. Rep. No. 92-1446 at 7 (Sept. 26,

1971).

76.     Indeed, when advocates for greater ORV use in Glen Canyon NRA proposed in

2013 that NPS create a second ORV "play area" at another location in the NRA, its

superintendent rejected the proposal, responding that it would be "inconsistent with NPS

guidance and policy, which do not promote the development of ORV play areas."  The Lone

Rock Beach ORV Play Area is unique in the National Park System.  NPS does not allow the type of unrestricted and high-intensity ORV use allowed at the ORV Play Area in any other place in the National Park System.

77.     In addition, NPS violated 36 C.F.R. § 4.10 because NPS made no effort to minimize adverse impacts on resources or conflicts with other visitors, as also required by that regulation, and provided no adequate explanation of any such effort.  *See* Exec. Order 11644 §§ 1, 3.

78.     NPS accordingly acted contrary to 36 C.F.R. § 4.10 and arbitrarily and capriciously in authorizing continued ORV use at Lone Rock Reach ORV Play Area.

**FOURTH CLAIM FOR RELIEF**
**(Orange Cliffs Management Unit -- Poison Springs Loop -- Adverse Impacts and Failure to Minimize; 36 C.F.R.  § 4.10 and Executive Order 11644; Section 10(e)(B)(1) of the Administrative Procedure Act for Agency Action Not in Accordance with Law and Arbitrary and Capricious)**

79.     Paragraphs 1-78 are hereby incorporated by reference in this Fourth Claim for Relief as if fully set forth herein.

80.     The ORV Plan and 36 C.F.R. § 7.70(f) will allow ORV use on the "Poison Springs Loop" in the Orange Cliffs Special Management Unit of the NRA ("Orange Cliffs").  The Poison Spring Loop consists of unpaved routes that, within the Orange Cliffs, are designated Routes 633 and 730.  ROD at 15.  Those routes intersect at Sunset Pass.  *See* Map, Exhibit A hereto.  Under the ORV Plan, ORV users on that "Loop" will not be required to obtain the kind of permit required of ORV users elsewhere under the ORV Plan.  *See* ROD at 10.

81.     Orange Cliffs is located in the far northern and eastern extremes of the NRA, far from human activity.  It contains "a scenic row of Wingate Sandstone cliffs, from the top of which one can view the vast and spectacular panoramas of [adjacent] Canyonlands National

Park." *See* FEIS at 175.  "The foreground view … is stunning, with the sandstone cliff face

plunging abruptly downward over 1,000 feet …." *Id.*  "The beauty of the landscape is

complemented by the area's isolation and solitude." *Id.* at 176.  In the 1979 General

Management Plan for Glen Canyon NRA (the "1979 Plan"), NPS determined that the Orange

Cliffs unit was to be "maintained as a critical backdrop for Canyonlands National Park and as a

major vantage point for spectacular views into the park." *Id.* at 32.  Moreover, NPS proposed

most of that area for designation as wilderness in that Plan.  Accordingly, that area has been

managed "to maintain a relatively primitive, undeveloped atmosphere." *Id.*

82.     Under an agreement between management of Glen Canyon NRA and the

management of Canyonlands, which is adjacent to Orange Cliffs, that Park has long managed

Orange Cliffs in the same manner as the adjacent area of Canyonlands is managed.  Canyonlands

explained in its Backcountry Management Plan, adopted in 1995, that the Orange Cliffs part of

Glen Canyon NRA was included

> because the area adjoins Canyonlands National Park, is similar in physiography,
> and is experiencing many of the same problems with growing visitation.  Thus, to
> increase consistency and protection for visitors to both the Maze District of
> Canyonlands and the Orange Cliffs in Glen Canyon, the Orange Cliffs will be
> managed in the same manner as the Maze District, with the exception of mandated
> differences in grazing in the Orange Cliffs.[4]

83.     There are no paved roads in Orange Cliffs.  There are only a number of unpaved

roads, many of which are unimproved.  *See* FEIS at 177.  No ORVs are permitted in

Canyonlands.  Since implementation of the Glen Canyon NRA 1979 Plan, ORVs have also been

prohibited in Orange Cliffs.  *Id.* at 57.  In 2006, Canyonlands' Superintendent issued a Directive

explaining that the prohibition "is based on the potential these machines possess for resource

---

[4] *See* Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation
Area, Backcountry Management Plan (Jan. 1995).

damage to soils, vegetation and wildlife, and for the visual and noise disturbance to other people

and on the requirements of Executive Orders 11644 and 11989 and 36 C.F.R. 1.5 and 4.10."

84.     ORV use in Orange Cliffs will create noise, dust and other harmful impacts on

resources, and will interfere with the ability of other visitors to enjoy that area and the adjacent

area of Canyonlands.  Such ORV use will, among other things, create unacceptable impacts by

unreasonably interfering with "the atmosphere of peace and tranquility, or the natural

soundscape maintained in … natural … locations within the park."  *See* 2006 NPS Management

Policies § 1.4.7.1.  Orange Cliffs is nowhere near Lake Powell, so permitting ORVs in Orange

Cliffs cannot be justified by the Enabling Act's purpose to allow outdoor recreation on and

adjacent to that lake.  That Act's other purpose is therefore the only one applicable to this area,

namely "to preserve scenic, scientific, and historic features" *id.,* and to enable a "person seeking

to escape most evidences of modern society [to] get a real backcountry experience" in the NRA.

H.R. Rep. No. 92-1446 at 7 (Sept. 26, 1971).  Orange Cliffs is such a backcountry area.

Allowing ORV use there will unreasonably interfere with "an appropriate use," *e.g.*, persons

hiking in the backcountry.

85.     NPS acknowledged that "[s]olitude and natural quiet are an important attribute of

Glen Canyon.  The natural sound in some places in Glen Canyon is as low as 10 dBA, making it

one of the quietest units of the National Park System.… Because of the low natural sound level

in much of Glen Canyon, a pass-by of an OHV or street-legal ATV can be heard over long

distances depending on the topographical features, reducing the listening area for humans and

wildlife …."  *See* ROD at 24 (emphasis added).  NPS also acknowledged in its FEIS that the

ORV Plan will have significant noise impacts, causing "irreversible or irretrievable commitments

of resources" relating to soundscapes.  FEIS at 473.

86.     NPS's noise impact conclusions are based significantly on the ORV Plan's setting a maximum noise level for ORVs of 96 dBA.[5]  *See, e.g.*, *id.* at 353.  That level is very loud, however.  A diesel truck emits sound at 84 dBA.  Moreover, ORV users generally travel in the backcountry in groups, so the actual sound level will be multiplied by the number of ORVs in the group.

87.     In addition, the 96 dBA limit would actually be no restriction at all because most vehicles easily meet it.  As the NPS acknowledged, "All machines purchased in the last decade would easily meet this [new] requirement unless the muffler system has been altered."  FEIS at A-116.

88.     NPS concludes that, by adopting the 96 dBA limit, 272,797 acres in Glen Canyon NRA "could potentially experience a 3-dBA increase above the natural ambient sound level as a result of motor vehicle operations."  FEIS at 315, 353.  "The natural ambient sound level is the sound level that would occur in the absence of human activities."  *Id.* at 315.  An increase of 3 dBA represents an increase of twice the sound pressure and a 20% increase in loudness.[6]

89.     One of the main unpaved roads in Orange Cliffs is called the Flint Trail.  The Poison Spring Loop runs in some places close to the Flint Trail used by non-motorized visitors.  *See* FEIS at 176-77.  The ORV noise from that "Loop" will impact users of the Flint Trail, as NPS acknowledges, as well as other visitors in the vicinity.  *Id.* at 359 (noise impacts would be

---

[5] "dBA" means decibels measured on an A-weighted scale.  A-weighted decibels are an expression of the relative loudness of sounds in air as perceived by the human ear.
[6] Increases on this scale are not of constant loudness or sound pressure; instead, increases are judged on a logarithmic basis.  On that basis, each increase of 10 on the scale represents a doubling of human perception of the sound's loudness and a ten-fold increase in the actual sound pressure.  As an example, an increase from 40 to 50 dBA represents a doubling of perceived loudness and a 10-fold increase in sound pressure, while an increase from 40-60 represents a 4-fold increase in loudness and a 100-fold increase in sound pressure.

"most noticeable … in the vicinity of Poison Springs Loop."). That ORV noise will certainly intrude upon the area's "isolation and solitude." *Id*. at 177.

90.    Moreover, ORV users driving on the Poison Spring Loop, and particularly the type represented by the Polaris RZR (*see* paragraph 28, *supra*) will be tempted to leave that route and drive on other unpaved routes where ORVs would not be permitted under the ORV Plan, or even to drive off routes altogether. Other unpaved roads lead from or nearby that Loop to overlooks into Canyonlands offering spectacular views. Officials in Canyonlands familiar with that area argued against allowing ORVs on the Poison Spring Loop in part because it was highly likely that ORV users would leave that remote and little patrolled Loop and travel to the overlooks or even into Canyonlands itself despite prohibitions against their doing either such thing. Even if the ORV users stopped at the overlook in Glen Canyon NRA, the noise and dust from the ORVs, argued the Canyonlands officials, would intrude into the experience of visitors camping or hiking in the adjacent area of Canyonlands for peace, quiet and solitude.

91.    NPS made no determination specifically as to ORV use in Orange Cliffs that such use would not "adversely affect" the NRA's resources, as required by 36 C.F.R. § 4.10. *See* Exec. Order 11644 § 3(a)(4). Instead, NPS merely stated that "this area is surrounded by cattle grazing and does not contain outstanding scenic values found elsewhere" in the Orange Cliffs, 86 Fed. Reg. at 3808. That statement is inconsistent with the facts before NPS and ignores, among other things, the impact of such ORV use on the soundscape in that area.

92.    NPS made no effort to locate ORV routes in Orange Cliffs so as to minimize adverse impacts on resources or conflicts with other visitors, as also required by 36 C.F.R. § 4.10, and NPS provided no explanation of any such effort. *See* Exec. Order 11644 §§ 1, 3.

36

93.     Accordingly, NPS violated 36 C.F.R. § 4.10 and acted arbitrarily and capriciously by allowing ORV use on the Poison Springs Loop in Orange Cliffs.

**FIFTH CLAIM FOR RELIEF**
**(The ORV Plan's Allowing of ORVs on More Than 200 Miles of Unpaved Park Roads --**
**Adverse Impacts and Failure to Minimize; 36 C.F.R. § 4.10 and Executive Order 11644;**
**Section 10(e)(B)(1) of the Administrative Procedure Act for Agency Action Not in**
**Accordance with Law and Arbitrary and Capricious)**

94.     Paragraphs 1-93 are hereby incorporated by reference in this Fifth Claim for Relief as fully set forth herein.

95.     The ORV Plan and 36 C.F.R. § 7.70(f) will allow street legal ATVs use on most paved and unpaved park roads in Glen Canyon NRA.  *See* paragraphs 28-29, *supra*, for explanation of such vehicles.  In addition, that regulation will allow ORVs that are not street legal on most unpaved roads.  There are more than 200 miles of unpaved roads that will accordingly be opened to such use under this provision.  36 C.F.R. § 7.70(f)(4)(i) and Table 2, 86 Fed. Reg. at 3814-15.  More than 50 miles of unpaved roads are mere trails created by unauthorized ORV traffic, which NPS refers to as "visitor created routes."

96.     Before adoption of 36 C.F.R. § 7.70(f), while NPS permitted street-legal ATV use on those roads, that use was not lawfully authorized.  NPS claims that street-legal ATV use on those unpaved roads was authorized by a Utah statute that allowed "street-legal ATVs" to drive on State and county roads, which NPS states was adopted as an NPS law by an NPS regulation that incorporates state traffic rules generally.  *See* FEIS at 10-11, 57-60, 86 Fed. Reg at 3808. For non-street-legal ORVs, NPS relies on a state law that allows such vehicles on roads "open to their use by the controlling federal agency," which NPS purports to invoke in a circular fashion by opening unpaved roads to use by such vehicles.  86 Fed. Reg at 3808.

97.     Before adoption of that Utah statute, NPS had asked the state to exempt roads in National Park System units, but the State did not adopt such an exemption.  After adoption of the statute, and as updated periodically since, NPS made a determination that it would nevertheless continue to prohibit such street legal ATVs on roads within National Park System units in Utah other than Glen Canyon NRA, explaining:

> The use on park roads of off highway vehicles (OHVs), all-terrain vehicles, (ATVs), and other motorized conveyances manufactured for recreational non-highway, off-road, or all terrain travel poses a significant risk to park resources and values which cannot be appropriately mitigated, and which cannot be sustained without causing unacceptable impacts.  The use of such vehicles is, therefore, not consistent with the protection of the parks and monuments.
>
> A clear purpose of such vehicles is to travel off-road.  Their capability to readily do so, the resource damage caused by off-road travel, and the lack of effective mitigation measures make their use inappropriate in these national parks and monuments.  Prevention of resource damage by off-road vehicle travel is essential, because once resources have been damaged it is difficult, if not impossible, to provide effective restoration.[7]

NPS last reaffirmed that determination in December 2019.

98.     Particularly in light of NPS's opposition to the Utah statute and its post-enactment determination not to allow any ORVs on roads within those other National Park System units, NPS's determination to allow street-legal ATVs on roads within Glen Canyon NRA, and NPS's determination to allow non-street-legal ORVs on most unpaved roads was arbitrary and capricious.  NPS's failure to explain why the NRA was being treated differently from all other Utah National Park System units is also arbitrary and capricious.  NPS's claim that allowing non-street-legal ORVs on unpaved roads was pursuant to state law, *see* 86 Fed. Reg. at 3808-09, was also arbitrary and capricious because NPS's justification was circular; the state law NPS cites only allows such vehicles on federal land if the federal agency allows it.

---

[7] https://www.nps.gov/arch/learn/management/april-2017-determination-ohv.htm.

99.     NPS compounded these arbitrary and capricious actions by purporting to evaluate the impacts of allowing at least street-legal ATVs on most roads by comparing allowing such vehicles to the situation before adoption of 36 C.F.R. § 7.70(f), when NPS was unlawfully allowing such use.  *See* 86 Fed. Reg. at 59-60 (including even 54 miles of "visitor created" and admittedly "unauthorized" routes).  Here, NPS acknowledged that it had allowed ORV use in the NRA without complying with legal requirements.  *See, e.g.*, FEIS at 2-3; paragraphs 30-31, 34, *supra*.  The purpose of the planning exercise at issue here was to evaluate whether to discontinue ORV use at the NRA or to bring itself into compliance with 36 C.F.R. § 4.10 and Executive Order 11644.  *Id.*  In such an evaluation, it is arbitrary and capricious to use as a baseline for comparison, *i.e.*, the "no action" alternative, the admittedly unlawful state of affairs before acting.  And that is particularly the case when one possible course of conduct would be to discontinue ORV use there.  *See* paragraph 30-31, *supra*.

100.    By incorporating Executive Order 11644, 36 C.F.R. § 4.10 requires that ORV use areas and trails be located to minimize "damage to soil, watershed, vegetation, or other resources of the public lands;" "harassment of wildlife or significant disruption of wildlife habitats;" and "conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands … taking into account noise and other factors."  Exec. Order 11644, § 3(a)(1)-(3); *see also Defs. of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (finding that NPS was required to investigate the impacts of each individual ORV route and area, and to not only consider but demonstrate that the decision to open trails or areas to ORV use "was made with the objective of minimizing impacts").

101.    Rather than minimizing visitor conflicts and adverse impacts, the ORV Plan and 36 C.F.R. § 7.70(f) would increase visitor conflicts and adverse impacts to resources.  For

example, NPS found that 21.8% of the Glen Canyon land area may experience a 3-dB increase in

natural ambient sound level due to increased ORV use under the ORV Plan.  *See* FEIS at 321,

Table 30 (as changed by Errata, ROD at Attachment C).  Over 6,000 acres and 21 miles of ORV

routes will experience crushing, shearing, compaction and erosion of soils.  *See* FEIS at xiii,

Table ES-3.  Likewise, the increased ORV use in areas such as the Ferry Swale management area

will cause conflicts with non-ORV users such as hikers and others seeking a "backcountry

experience."  *See* FEIS at 372, 368.

102.    NPS acknowledges that the ORV Plan would expand motorized use and have the

greatest potential to impact resources and result in disturbances to soils, vegetation, soundscape,

cultural resources, and wilderness.  *See* FEIS at 92.  By authorizing ORV use on over 300 miles

of roads, including 220 miles of unpaved roads throughout the NRA, the opportunity to create

many new miles of illegal routes with subsequent impacts on natural and cultural resources

would be extensive.

103.    For these and other reasons, NPS's adoption of the ORV Plan and 36 C.F.R.

§ 7.70(f) that allows ORV use on NRA roads was arbitrary and capricious and contrary to 36

C.F.R. § 4.10 and Executive Order 11644.

**SIXTH CLAIM FOR RELIEF**
**(Underassessment of Adverse Impacts on Soundscape, Among Other Things -- Section**
**10(e)(B)(1) of the Administrative Procedure Act for Arbitrary and Capricious Agency**
**Action)**

104.    Paragraphs 1-103 are hereby incorporated by reference in this Sixth Claim for

Relief as if fully set forth herein.

105.    NPS's conclusions about the extent of impacts of the ORV Plan on Glen Canyon

NRA's resources and values are arbitrary and capricious.  It is highly likely that those impacts

will be even greater than NPS concluded.  This is so, among other reasons, because one of the

40

most significant problems caused by ORVs is the noise they generate, and while NPS concluded that the Plan's soundscape impact would be substantial, NPS's noise impact assessments of the ORV Plan's impacts were fundamentally flawed.

106.    NPS concludes that, by adopting the 96 dBA maximum noise standard, 272,797 acres in Glen Canyon "could potentially experience a 3-dBA increase above the natural ambient sound level as a result of motor vehicle operations."  FEIS at 315, 353.  NPS reaches its 3 dBA increase conclusion, however, by averaging the impact over 272,797 acres.  The sound impact will be higher than a 3 dBA increase for visitors and animals close to the road or route over which the ORV is traveling, such as visitors hiking along a road as an ORV passes by, particularly if it is accelerating or on an incline.  The impact on such a visitor is more likely to be at or above the 96 dBA "maximum."  NPS recognizes that "[t]he sound level and thus the intensity of impact is greatest close to the source (the OHV, street-legal ATV, or conventional motor vehicle) and decreases with increasing distance."  *See* ROD at 24.  The impact also increases as the traffic volume increases, as well as "activities at higher speed" and with acceleration.  *Id.* at 24-25.

107.    Moreover, NPS's noise standard will not keep the noise level even at the 96 dBA "maximum" that NPS claims.  That is so because NPS's new noise limit of 96 A-weighted decibels is measured using the "SAE J1287" standard.  *See* FEIS at 38.  SAE International ("SAE") is an organization that produces a variety of technical standards.  SAE J1287 is one of those standards, to be used for testing exhaust noise from a motorcycle.

108.    SAE states that "[t]his SAE Standard establishes the test procedure, environment, and instrumentation for determining the exhaust sound pressure levels of motorcycles under stationary conditions.  Care must be taken not to confuse stationary sound pressure levels with

total motorcycle sound pressure levels.  This test does not evaluate total motorcycle sound during operation."  *See* SAE J1287 at 1 (2008 Revision).  The sound level is determined at twenty inches from the exhaust of a motorcycle in a stationary position with the rider running the engine in neutral at a speed equal to one-half of the rated engine speed (*i.e.*, at half throttle).  *Id.* at 3.

109.    By measuring vehicle noise using SAE J1287, NPS will necessarily underestimate —by an unknown but likely significant amount—the actual impacts of the ORV Plan on the natural soundscape.  ORVs being ridden inside Glen Canyon NRA will likely be operating above half the rated engine speed (*i.e.* above half throttle), particularly as they shift up or down or traverse difficult terrain, producing significantly more noise than that measured in a stationery position by use of SAE J1287.  Accordingly, if an ORV measures a noise level of 96 dBA under SAE J1287 while at rest and at half-throttle, that vehicle will in fact emit a higher level of sound than 96 dBA when in actual use.  NPS also ignores the fact that ORV users generally travel in groups, particularly in the backcountry, multiplying the actual noise by the number of ORVs in the group.  In addition, "total vehicle noise" will in any event be greater than that measured under SAE J1287.

110.    Even if application of the SAE J1287 standard were otherwise reasonable, NPS's reliance on its noise limitation measured under that standard depends on NPS's ability to enforce that standard.  NPS's Promulgating Release explains that "[e]nforcement of this standard may include courtesy checks, checkpoints, and individual contacts.  Measurements would be taken using certified equipment and protocols as is done with traffic radar."  86 Fed. Reg at 3806; *see also id. at* 3811.  This explanation, however, is unrealistic.

111.    Application of SAE J1287 requires a protocol including a stationary test vehicle, specific testing instruments, specific testing conditions (including low noise) and a test site.

42

While SAE states in supplementary materials that the procedure has been used in other conditions, it also states that results using variations of test parameters specified in the standard should not be reported as having been obtained according to J1287. Accordingly, the use NPS proposes to make of that standard would not produce results that, according to SAE, could be reported as having been obtained under that standard. In areas like Glen Canyon NRA, where enforcement must be effectuated over extensive areas of back roads in non-standard conditions, use of SAE J1287 accordingly renders enforcement impractical. Without adequate ability to enforce its standard, NPS's reliance on its noise limitation is arbitrary and capricious.

112.    Finally, even if SAE J1287 actually measured total sound (it does not) and were enforceable (it is not), NPS's analysis is flawed for other reasons as well. For example, as noted above, NPS has stated that vehicles sold in the last decade would "easily" meet SAE J1287. NPS does not explain how SAE J1287 will limit noise if it does not affect the kinds of vehicles used in Glen Canyon NRA.

113.    Accordingly, NPS's conclusions about the extent of impacts of the ORV Plan on Glen Canyon NRA's natural soundscape and other resources and values are arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NPCA respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants, as follows:

A.    Ordering, declaring, and adjudging that Defendants adoption of the ORV Plan ROD for Glen Canyon NRA and 36 C.F.R. § 7.70(f) was arbitrary and capricious and not in accordance with law in that it violated the Organic Act, the Glen Canyon NRA Enabling Act, 36 C.F.R. §4.10 and Executive Order 11644;

B.   Vacating 36 C.F.R. § 7.70(f) and the ROD on which it is based;

C.   Remanding to the NPS with appropriate directions to bring itself into compliance with applicable legal requirements and limitations;

D.   Award Plaintiff's reasonable attorneys' fees and other litigation costs reasonably incurred, pursuant to 5 U.S.C. § 552(a)(4)(E)(i); and

E.   Grant such further relief as the Court deems necessary or appropriate to redress the Defendants' legal violations.


Dated: April 16, 2021


Respectfully submitted,

/s/ *Robert D. Rosenbaum*
Robert D. Rosenbaum (D.C. Bar No. 90498)
Jonathan Martel  (D.C. Bar No. 428135)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Tel.: (202) 942-5862
Fax: (202) 942-5999
E-mail: robert.rosenbaum@arnoldporter.com
E-mail: jonathan.martel@arnoldporter.com


*Counsel for Plaintiff National Parks*
*Conservation Association*

44

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2021, I electronically filed the foregoing AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

/s/ Robert Rosenbaum
Robert D. Rosenbaum

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

*Counsel for Plaintiff National Parks Conservation Association*

45